No. 2--05--0185                                                    filed: 11/28/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03--CM--3192 |
| LEONARD QUEEN, | ) ) | Honorable Helen S. Rozenberg, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Leonard Queen, appeals the judgment of the circuit court of Lake County denying his motion to quash his arrest and suppress a switchblade that was found on his person after the police seized him. We affirm, holding that the seizure that led to the discovery of the switchblade was justified as an exercise of the community caretaking authority of police.

Defendant was charged with unlawful use of a weapon (720 ILCS 5/24--1(a)(1) (West 2002)) for possessing the switchblade. In his motion to quash arrest and suppress evidence, defendant asserted that, at the time he was seized, the police "did not have probable cause, or a reasonable suspicion based on facts, to believe that [he] had [sic] or was about to commit a crime."

Mark Fragale, a Lake Villa police officer, was the sole witness at the hearing on defendant's motion to quash and suppress. Fragale testified that on May 8, 2003, at 2 a.m., he entered an apartment complex in Lake Villa to drop off the victim of a domestic battery. After dropping off the

victim, and while driving his squad car on the entrance drive of the complex, Fragale saw defendant fall out of a tree and land on a grassy area about 20 feet in front of the squad car. Defendant was holding a beer bottle. He "swayed" as he regained his feet, and he appeared to be "intoxicated." Fragale testified that defendant did not spill any of the beer as a result of the fall and that he appeared uninjured. Upon seeing defendant, Fragale activated the spotlight of his squad car and stepped out of the car.

Fragale's testimony as to what he did next is ambiguous. At one point, Fragale testified that he "direct[ed]" defendant to come over to the squad car. At another point, however, he testified that he "asked" defendant to approach the squad car. Specifically, Fragale testified that he asked defendant, "Can I talk to you?" At yet another point in his testimony, Fragale testified that he did not remember whether he asked defendant "Can I talk to you?" before or after he "asked [defendant] to come over to the car."

In any case, Fragale testified that, as defendant approached the squad car, he "stumbl[ed] a bit." Fragale testified that defendant was covered with grass and mud even though the spot where he had fallen was not muddy. After defendant reached the squad car, Fragale observed that defendant's speech was slurred, his eyes were red and glassy, and he smelled strongly of an alcoholic beverage. Fragale asked defendant for his name and identification. Asked why he made these requests, Fragale testified: "I was trying to find out where [defendant] lived so I could give him a ride home." Fragale testified that he was concerned that defendant could not safely get home by himself due to his intoxication. Fragale testified that defendant did not "request" a ride in the squad car but "agreed" to a ride. As it was departmental policy to "search [passengers] for weapons" before allowing them in a squad car, even if only for a courtesy escort, Fragale asked defendant if "he had

anything on his person." In response, defendant turned away from Fragale and reached his hand into a pocket that was out of Fragale's line of sight. Alarmed by this "furtive movement," Fragale ordered defendant to show what was in his hand. Defendant opened his hand, displaying a knife that was laid across the palm. The knife appeared to Fragale to be an ordinary folding knife. The knife was open, and its blade was about three inches long. Defendant did not make any threatening gestures with the knife once he revealed it. Fragale then "arrested [defendant] for disorderly conduct due to his level of intoxication." Upon reaching the police station, Fragale placed the knife in a locked evidence box. Later, after defendant was released from custody, Fragale examined the knife more closely and realized it was a switchblade knife. Pursuant to a warrant, Fragale arrested defendant for unlawful use of a weapon.

At the conclusion of the testimony, defendant argued that Fragale's interaction was not a community caretaking encounter because he "order[ed] [defendant] to come to the squad car," shined his light on defendant, and took defendant's driver's license. Rather, defendant argued, Fragale's actions effected a "Terry stop" (see Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) for which there was no justification because "[f]alling out of a tree simply is not a crime." Defendant further argued that Fragale lacked probable cause to arrest defendant for disorderly conduct, because a reasonable person would not have been alarmed or disturbed by defendant's actions. See 720 ILCS 5/26--1(a)(1) (West 2002) ("A person commits disorderly conduct when he knowingly *** [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace").

The trial court denied defendant's motion to quash and suppress, reasoning as follows:

"The police officer had someone fall in front of him out of a tree with a bottle of beer in his hand. He called the defendant over to see if he was all right, asked for identification so that he could give him a ride home. That was the undisputed testimony. To say that the officer testified credibly is indeed an understatement. And the officer testified further that he didn't intend to arrest the defendant. He intended to give him a ride home. It was only when the defendant produced a knife in a gesture that would have entitled a police officer to be alarmed and disturbed that an arrest was made."

Following a bench trial, defendant was convicted of unlawful use of a weapon (720 ILCS 5/24--1(a)(1) (West 2002)). He filed this timely appeal.

In reviewing a trial court's decision on a motion to suppress, we apply a bifurcated standard of review. People v. Sorenson, 196 Ill. 2d 425, 431 (2001). We accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. Sorenson, 196 Ill. 2d at 431. However, we review de novo the ultimate question of whether the evidence should be suppressed. Sorenson, 196 Ill. 2d at 431. Although only one witness, Officer Fragale, testified at the suppression hearing, his testimony admits of divergent inferences as to whether he asked or ordered defendant to walk over to the squad car after seeing defendant fall from the tree and as to whether defendant was given a choice of declining a ride home in the squad car. The resolution of such conflicts falls to the trier of fact. People v. Moore, 365 Ill. App. 3d 53, 58 (2006). It appears that the trial court resolved the conflicts in favor of defendant and found that Fragale effected a seizure when he called defendant over to the squad car. We do not address the trial court's resolution of that conflict but assume for purposes of our review that Fragale

effected a seizure when he called defendant over to the squad car. We review de novo whether that seizure was justified.

Defendant contends that the trial court erred in denying his motion to quash and suppress. Defendant submits that Officer Fragale effected a stop when (in defendant's terms) he "activated his spotlight *** and ordered defendant to walk over to the squad car." Because the encounter was nonconsensual, defendant reasons, the community caretaking doctrine necessarily was inapplicable. Defendant further argues that the stop was not justified under Terry because, up to that point, Fragale had only observed defendant fall from a tree while intoxicated and "being intoxicated is not against the law." Defendant argues that all subsequent interaction between defendant and Fragale was the fruit of the invalid Terry stop.

In response, the State says it "has no dispute with the general propositions of law applicable to search and seizure presented by defendant." Although the State does not expressly invoke the community caretaking doctrine, it submits that "defendant's tumultuous appearance *** justifiably prompted [Fragale] to stop and check on defendant." The State argues that, upon observing that defendant was intoxicated, Fragale had cause to arrest him for violating a Lake Villa ordinance against public intoxication.

As noted, we assume for purposes of our review that Fragale seized defendant when he called him over to the squad car and that the detention continued up to and through defendant's arrest. That detention was, in our view, justified.

Defendant's argument on appeal is marred by his flawed conception of community caretaking encounters. Citing the Third District Appellate Court case of People v. Laake, 348 Ill. App. 3d 346, 349 (2004), defendant states that "[t]he community caretaking exception to the Fourth Amendment

does not apply if the citizen is detained." This district, in two recent cases, has expressed a different view of the community caretaking function from that held in Laake. See People v. Luedemann, 357 Ill. App. 3d 411 (2005) (Luedemann I), rev'd on other grounds, No. 100914 (October 5, 2006) (Luedemann II); People v. Mitchell, 355 Ill. App. 3d 1030 (2005). In Mitchell, the State presupposed that the community caretaking doctrine was limited to consensual encounters. We rejected that approach while noting that it has been embraced in several Illinois decisions, including Laake:

"The State confuses encounters justified by the community caretaker exception with consensual encounters. This is not at all surprising, since the same confusion appears in numerous Illinois cases. See, e.g., People v. Harris, 207 Ill. 2d 515, 522 (2003); People v. Murray, 137 Ill. 2d 382, 387 (1990); People v. Laake, 348 Ill. App. 3d 346, 349 (2004). This confusion is unfortunate. As it has developed in other jurisdictions, the community caretaker doctrine is a viable, logical exception to the requirements of probable cause and reasonable suspicion when the police invade an interest protected by the fourth amendment. It has nothing to do with consensual encounters; for, by their very nature, consensual encounters need no justification. Treating it as synonymous with consensual encounters deprives the doctrine of any analytic content." Mitchell, 355 Ill. App. 3d at 1033.

In Luedemann I, we said: "[T]he community caretaking exception allows an actual seizure where the seizure is reasonable under certain circumstances." Luedemann I, 357 Ill. App. at 419. In Luedemann II, which was issued after the briefs in this case were filed, our supreme court agreed that the community caretaking doctrine may be invoked "to uphold searches or seizures as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute." Luedemann II, slip op. at 12.

In neither Mitchell nor Luedemann I did we have occasion to apply the community caretaking doctrine as we defined it to the facts then before us. In Mitchell, we held that the State waived its argument under the community caretaking doctrine, but we nonetheless elected to correct the State's misconception of the doctrine. See Mitchell, 355 Ill. App. 3d at 1035-36. In Luedemann I, we considered the State's invocation of the doctrine "both improper and unnecessary." Luedemann I, 357 Ill. App. 3d at 420. Similarly, in Luedemann II, the supreme court clarified the proper nature of community caretaking encounters, yet the case did not require the court to apply that understanding to the facts before it. We now do what there was no occasion to do in Mitchell, Luedemann I, and Luedemann II, that is, hold that the detention of an individual by the police was justified as an exercise in community caretaking.

The legal principle we embrace today is a simple extension of existing cases recognizing the legitimacy of searches and seizures based on community caretaking or public safety considerations. The United States Supreme Court's decision in Cady v. Dombrowski, 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528 (1973), is often cited as the originator of the community caretaking or public safety doctrine. In Cady, the defendant's car was towed to a private lot after a car accident. Because the police reasonably believed that the car contained a gun that might be taken by vandals while the car sat unattended in the lot, the Supreme Court held that a search of the car for "the protection of the public" was permissible. Cady, 413 U.S. at 447, 37 L. Ed. 2d at 718, 93 S. Ct. at 2531. The Court explained:

> "Because of the extensive regulation of motor vehicles and traffic, and also because
> of the frequency with which a vehicle can become disabled or involved in an accident on
> public highways, the extent of police-citizen contact involving automobiles will be

substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady, 413 U.S. at 441, 37 L. Ed. 2d at 714-15, 93 S. Ct. at 2528.

In People v. Ocon, 221 Ill. App. 3d 311, 316 (1991), this district upheld the inventory search of a vehicle impounded after the defendant's arrest for driving without a license. We said:

"The inventory of the contents of cars taken into police custody fulfills the community caretaking function of the police. [Citation.] Thus, inventory searches are a well-established exception to the warrant requirements of the fourth amendment. [Citation.] Probable cause, which is peculiar to criminal investigations, is unrelated and of no help in the reasonableness analysis required under the fourth amendment for routine administrative caretaking functions such as inventory searches. [Citation.] Rather, the reasonableness of such procedures arises from three legitimate objectives of inventory searches: to ascertain the extent and value of property needing protection while in police custody; to protect the police against claims or disputes over lost or stolen property; and to protect the police from potential danger emanating from items of personal property such as drugs or guns that may be found within a car. [Citations.]" Ocon, 221 Ill. App. 3d at 314-15.

More factually similar to the present case is our recent decision in People v. Smith, 346 Ill. App. 3d 146 (2004), aff'd, 214 Ill. 2d 338 (2005). In Smith, we cited Cady in applying community

caretaking/public safety principles to uphold the "suspicionless seizure of a person." Smith, 346 Ill. App. 3d at 161. The defendant in Smith was one of three passengers in a car that police stopped for traffic offenses on an interstate highway. Following the driver's arrest for driving under the influence of alcohol, the officers determined that none of the passengers was able to drive the vehicle from the scene, because the defendant and one other passenger were intoxicated and the third passenger had a suspended driver's license. The officers gave the defendant and his companions the option of using their cellular telephone to arrange for transportation. When the three were unsuccessful in making such arrangements, the officers offered them the option of a courtesy ride to the police station, but did not offer them the option of leaving the scene on foot. The defendant and the others agreed to the proposal. Before letting them into the squad car, however, the officers performed pat-down searches of them pursuant to departmental policy requiring that officers search individuals for weapons prior to transporting them in a police vehicle. A handgun was found on the defendant's person, and he was arrested. Smith, 346 Ill. App. 3d at 149-51.

We reversed the trial court's decision granting the defendant's motion to suppress the handgun as the fruit of an illegal detention. We agreed with the defendant that, when he and his companions were unsuccessful in arranging for their own transportation, the officers effected a detention by "prohibiting defendant and his companions from driving the vehicle in which they arrived and by *** not offering defendant the option of departing on foot." Smith, 346 Ill. App. 3d at 157. We identified the central issue as whether that detention was illegal and therefore vitiated the defendant's consent to the courtesy ride and pat-down search. We held that the detention was lawful on two independent grounds. First, "the police officers were justified in detaining defendant based on a reasonable suspicion that criminal activity was about to occur," because it would have been illegal

under our state statutes for the defendant to walk on the interstate while intoxicated. Smith, 346 Ill. App. 3d at 159. Second, the seizure was lawful as a reasonable extension of the principles laid down in Cady. Although Cady dealt with a search of a vehicle, not the detention or search of a person, we held that its rationale "justifying police action in an emergency that would otherwise be prohibited by the fourth amendment is equally applicable here." Smith, 346 Ill. App. 3d at 161. We said:

> "In this case, defendant was in need of emergency aid because he found himself on the side of a high-speed tollway at night without a lawful means of reaching safety while in the vulnerable position of being impaired due to his consumption of alcohol. *** Where, as here, police action is not motivated by crime detection or investigation but, rather, by an intent to render aid in an emergency situation, a suspicionless seizure of a person in furtherance of that goal does not violate the fourth amendment. Accordingly, we believe that the officers' actions in this case, that is, prohibiting defendant from walking from the scene and providing him with a courtesy ride when all other options for defendant's safe and lawful departure from the roadside were exhausted, amounted to a lawful seizure consistent with the officers' duty to render aid to defendant." Smith, 346 Ill. App. 3d at 161-62.

We also held that, irrespective of the defendant's consent, the officers' decision to transport him and the others in the squad car was lawful based on exigent circumstances. The officers, we explained, "had a duty to remove defendant and [his companions] from the roadside after all apparent lawful means of leaving the roadside had been exhausted." Smith, 346 Ill. App. 3d at 164. We noted that, "had the officers left these men standing on the roadside, they would have created a situation that was undeniably dangerous to them and to motorists using the tollway." Smith, 346 Ill. App. 3d at 164. We upheld the pat-down searches as well, on the basis that "the need to transport a person

in a police vehicle is an exigency that justifies a pat-down search for weapons." Smith, 346 Ill. App. 3d at 166.

The principles annunciated in Cady, Ocon, and Smith apply in the present case. The parties agree that Fragale effected a stop when he "directed" defendant over to the squad car. The State, arguing for a community caretaking rationale in substance if not in name, asserts that defendant's bizarre and potentially injurious entry onto the scene gave Fragale warrant to "stop and check on" him. Defendant, operating under the erroneous notion that all seizures must be justified by an objective suspicion of criminal activity, does not challenge the State's position nor could he credibly do so. Defendant had just fallen out of a tree. Although Fragale quickly surmised that defendant was not injured by the fall, Fragale suspected that defendant was intoxicated, based on his unsteady movements. Fragale was justified in having defendant approach and identify himself. When defendant approached, his appearance and demeanor confirmed Fragale's belief that he was intoxicated. Fragale believed that defendant was in need of a courtesy ride in the squad car because he could not proceed safely in his condition without assistance. Fragale's concern was well-founded. Defendant's unexplained bout of tree climbing suggested that he might be capable of further erratic behavior that could endanger himself or others. He was covered in mud that apparently came from some prior escapade.

In these circumstances, defendant's consent to the courtesy ride was as immaterial as the defendant's consent in Smith. Defendant, intoxicated and given to bizarre behavior, was in as vulnerable a position as the defendant in Smith. For Fragale to leave defendant to proceed by himself would have created a situation "undeniably dangerous" to him. Smith, 346 Ill. App. 3d at 164. Fragale had a duty to insure that defendant did not proceed alone.

Fragale, we recognize, did not offer defendant any option other than to ride in the squad car. This omission did not invalidate Fragale's actions as an exercise in community caretaking. We acknowledge that, in holding that the officers in Smith were justified in removing the defendant from the roadside regardless of his consent, we said: "Under these circumstances, once all other legal options for the removal of defendant from the roadside were exhausted, the officers' duty to safely do so arose." Smith, 346 Ill. App. 3d at 166. The import of this remark is that the existence of means short of a seizure for delivering an individual from danger is an important consideration in determining whether there is an exigency that would justify police action in the first instance. The remark should not be construed as a mandate that a peace officer who encounters an individual in an exigent situation must conceive and explore all means short of a seizure for bringing the individual to safety. The overarching criterion for searches and seizures is reasonableness. Luedemann I, 357 Ill. App. 3d at 419. Defendant does not identify for us what other avenues Fragale should have explored. If defendant had suggested to Fragale an alternative for proceeding safely that would not have unduly delayed Fragale or otherwise sapped law enforcement resources, perhaps Fragale would have had some duty to pursue it. As it stood, however, defendant was not forthcoming with any alternatives to delivering himself from the potentially hazardous situation that apparently was his own doing.

Fragale, therefore, was justified in taking defendant in the squad car irrespective of defendant's consent and Fragale's failure to explore whether there were any possible alternative means of getting defendant to safety. Fragale was further justified in performing a pat-down search of defendant for safety purposes before transporting him in the squad car. See Smith, 346 Ill. App. 3d at 166 (holding that "the need to transport a person in a police vehicle is an exigency that justifies a pat-down search

for weapons"). When Fragale asked defendant if he "had anything on him," he furtively turned his body away from Fragale and fumbled in a pocket that was out of Fragale's line of vision. After discovering that defendant was holding a knife, Fragale arrested him for disorderly conduct "due to his level of intoxication." Defendant submits that "being intoxicated is not against the law." However, in determining whether there was probable cause to arrest defendant, we are not limited by what Fragale subjectively believed were grounds for the arrest. See People v. Gray, 305 Ill. App. 3d 835, 839 (1999) (in determining probable cause for arrest, "[a]n objective test applies" and "[t]he subjective intentions or beliefs of the officer are not dispositive"); 4 W. LaFave, Search & Seizure §9.5(a), at 473 (4th ed. 2004) ("the objective grounds as to one offense are not defeated because the officer either thought or stated that he was acting with regard to some other offense or on some other basis entirely"). There was an alternative basis for arresting defendant for disorderly conduct. "A person commits disorderly conduct when he knowingly *** [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace" (720 ILCS 5/26--1(a)(1) (West 2002)). "What is reasonable *** depends upon the facts and circumstances of the particular case." People v. Davis, 79 Ill. App. 3d 784, 786 (1979), rev'd on other grounds, 82 Ill. 2d 534 (1980). Fragale testified that he was alarmed by defendant's furtive movements in response to his question. Defendant's conduct, moreover, was unreasonable under the circumstances. Rather than answer Fragale's query, defendant made suspicious and possibly threatening motions, needlessly creating tension. That tension was immediately heightened by Fragale's discovery that defendant had been concealing a knife in his hand. We conclude that Fragale had probable cause to arrest defendant for disorderly conduct based on his reaction to Fragale's query.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County denying defendant's motion to quash and suppress.

Affirmed.

BOWMAN and KAPALA, JJ., concur.